Opinion issued June 3, 2010









 








In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-09-00319-CV
__________
 
DENNIS J. WILKERSON, Appellant
 
V.
 
LINETT M. WILKERSON, Appellee
 

 
 
On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2009-11524
 

 
 
O P I N I O N
          Appellant, Dennis J. Wilkerson, challenges the trial court’s order granting
appellee, Linett M. Wilkerson’s, application for a family violence protective order
under section 82.002 of the Texas Family Code. See Tex. Fam. Code Ann. § 82.002
(Vernon 2008). In four issues, Dennis asserts that this case is not an “appropriate
case” for the issuance of a family violence protective order, the trial court’s family
violence protective order “is based on argument, innuendo, and inadmissible
evidence,” and there is legally insufficient evidence to support the trial court’s
findings that family violence occurred in the past and is likely to occur in the future. 
          We affirm.
Factual and Procedural Background
          Linett is the third wife of James H. Wilkerson (Jim), who died on November
11, 2003. Dennis is Jim’s son from his first marriage. In September 2004, Linett
sued Dennis, asserting claims against him for breach of fiduciary duty and fraud
“relating [to] the mismanagement and conversion of partnership and corporate assets
of various family-owned entities.” In February 2009, Linett, the executor of Jim’s
estate and the trustee of trusts for their four children, filed her application for a family
violence protective order against Dennis alleging that he, in “an attempt to coerce”
her into abandoning her underlying lawsuit, had made threats of bodily injury and
death against her and her and Jim’s four children, Rushton, Jarod, Andriel, and Loriel. 
Linett attached to her application her affidavit in which she described threats made
by Dennis toward her and her children as well as threats made by Robert Lee
“Buddy” Williams, who Linett described as Dennis’s friend and business associate. 
          Dennis filed an answer, generally denying Linett’s allegations, and Dennis filed
a competing application for injunctive relief. Dennis stated that the underlying
lawsuit involved a complex dispute regarding the ownership and valuation of various
family-owned entities. Dennis alleged that he had been business partners with his
father Jim in a number of successful entities and that, following Jim’s death, Linett
began threatening and harassing him and other employees of these entities. Dennis
also asserted counterclaims for invasion of privacy and defamation.



          The trial court conducted a two-day hearing on Linett’s application. At the
hearing, Linett testified that she had been married to Jim for sixteen years until Jim’s
death from cancer in late 2003. Linett explained that Jim had been diagnosed with
cancer in 1996 and that she had served as Jim’s caretaker during his illness. Linett
and Jim had four children together, ranging in ages from 10 to 14, at the time of Jim’s
death.  
          Shortly after Jim’s death, Dennis came to her house to ask about her future
plans. When Linett explained to Dennis that she intended to learn about the family
businesses, Dennis became furious and told Linett that she had “no business” in one
of the businesses, the Augusta Pines golf course. Dennis then instructed Linett to
follow him to the gazebo outside, where Dennis told Linett that he ran the business.
He told her that he was “a good shot,” grabbed some cans from a refrigerator in the
gazebo, tossed them on the ground, pulled out a gun, and shot each of the cans. He
then told Linett, “I never miss.” Linett was trembling and felt threatened, and she felt
Dennis was capable of causing bodily harm to her and her children. Dennis then
instructed Linett to follow him to his truck, showed her ammunition in his glove
compartment, and said, “See, I always have plenty of ammunition.” Linnet went to
her room and began crying, but did not call the police, explaining that it was not her
nature to get law enforcement authorities involved, that this was her husband’s son,
and that she was trying to prevent her children from learning that they had “a violent
brother.” Linett stated, however, that she subsequently hired a private investigator,
Bill Young, for safety reasons. She also testified that, after the shooting incident, she
no longer allowed Dennis on the premises. 
          Linett further testified that in January 2004, she began working at Augusta
Pines on a frequent basis to become involved in the businesses. As executor of Jim’s
estate, Linett hired accountants to gather necessary financial information to probate
the estate and to audit the family-owned entities. At one point, Dennis called a
meeting and told Linett that she was not to “get in his way,” she had to ask him first
if she needed anything, that he would steal, cheat, and lie to get his way, and if she
got in his way “something would happen” to her. Linett stated that Dennis threatened
her with bodily injury over nine times while at Augusta Pines. In September 2004,
after Dennis had refused her attempts to obtain financial information, she filed the
underlying lawsuit. 
          After Linett filed the lawsuit, Williams, Dennis’s friend, came to her house
twice regarding the lawsuit. During the second visit, Linett testified that Williams
told her that Dennis had sent him to make her an offer of $4 million to never return
to Augusta Pines and to let Dennis run the business. During this visit, Williams told
her, “You do realize anything can happen to you? You can disappear and nobody will
know. We can take your children hunting and there can be an accident and nobody
will know what happened.” After Williams made these statements, Jarod, Linett’s
son, walked toward her and Williams, and Williams invited Jarod on a hunting trip. 
After Jarod expressed interest, Williams turned to Linett and said, “See how easy that
would be.” Linett felt like she was “dying” because she believed that Williams was
threatening her children too. 
          Subsequently, at some point in 2005, after Linett had filed a temporary
restraining order in order to get records needed as executor of the estate, Linett met
with Williams at a restaurant at Williams’s request. Williams told her that he had
been sent there by Dennis to act as a mediator and try to settle the lawsuit for $10
million. After Linett declined the offer, Williams told her that she was being offered
a lot of money to walk away with her and her children’s lives. Linett said that she
asked her investigator, Young, to come with her to the restaurant because she did not
feel safe. Finally, Linett testified that in January 2009, shortly after a scheduled
mediation in the underlying lawsuit had failed, she received a call from her son Jarod
informing her that Williams had come to their house, drunk, with a gun, looking for
her. 
          On cross-examination, Linett agreed that Dennis never caused her any physical
harm and that she never informed law enforcement authorities of any threats. She
also agreed that, after the shooting incident, she and her family visited Dennis’s home
for a holiday celebration explaining that it was the first Christmas after her husband’s
death and that she didn’t want to spoil her children’s Christmas traditions. Although
she further agreed that she had allowed her sons to go hunting with Dennis around
this time, she remembered the hunting trip as occurring shortly after Thanksgiving
in early December prior to the shooting incident. She stated that Dennis had not been
to her house in four to five years and that in the beginning of 2004, she made repeated
trips to Augusta Pines to review records. At some point, Dennis began telling her that
he was going to kick her out of Augusta Pines and that he planned to call the police. 
Linett also agreed that in 2008, after a shareholders meeting that she attended at
Augusta Pines, Dennis again demanded that she leave Augusta Pines immediately
after the conclusion of the meeting or he threatened that he would call the police. 
          Dennis testified that, after his father’s death in November 2003, Linett and her
family attended a Christmas Eve dinner at his house. He also testified that he took
Jarod, Rushton, and some other family members hunting, although he claimed that
the hunting trip took place after the Christmas holidays instead of in early December 
as Linett had remembered. Dennis denied the incident involving the shooting, but
stated that in January or February 2004, he showed Linett how to use a gun, at her
request. 
          Dennis further testified that, after his father’s death, Linett spent every day at
the Augusta Pines office. Dennis gave Linett office space and employees to retrieve
requested records. 
          Seven months after his father’s death, after Linett and her accountant had
reviewed three years of records, Dennis believed that Linett’s continued records
requests had become too onerous. Dennis also had a problem with Linett during the
summer of 2004 when he discovered that Linett had removed original records from
the Augusta Pines office. When Dennis confronted Linett, Linett became more
disruptive around the office. In June 2004, Dennis instructed his employees not to
provide Linett any additional records without his permission. Shortly after, in
September 2004, Linett filed the underlying lawsuit. 
          Dennis said that, several weeks after Linett filed suit, Linett appeared at a golf
tournament at Augusta Pines with her two daughters. Dennis told Linett that she was
no longer welcome at Augusta Pines and that she would have to leave or he would
call the police. Linett continued to go to Augusta Pines, and Dennis recalled at least
three other occasions through 2006 where he had told Linett to leave or he would call
the police. On one occasion, Linett threatened Dennis that she would “be getting rid
of [him].”
          Dennis then referred to an incident in April 2007 when police were actually
called to remove Linett from Augusta Pines. Dennis also recalled an incident in 2008
when, after a shareholders meeting, Linett became angry and threatened to get Dennis
“no matter what.” Dennis testified that he considered this a threat because he
determined Linett’s demeanor was “changing” and she was “going over the edge.”
          Dennis also denied ever asking Williams to act on his behalf and claimed that
the only conversation he ever had with Williams regarding the underlying lawsuit was
when he told Williams that Linett had sued him. Dennis admitted that, on January 14,
2009, the date on which Williams allegedly went to Linett’s house with a gun, he had
played golf with Williams and also had multiple phone conversations with Williams
that evening. On cross-examination, Dennis agreed that he was close friends with
Williams.
          Elvia Dubon, Linett’s housekeeper, testified that she witnessed Dennis
shooting a gun at Linett’s home and later found cans with holes in the yard. Bill
Young, Linett’s private investigator, testified that he had witnessed the meeting
between Linett and Williams at the restaurant and that Linett appeared to have been
threatened by the way she was acting, although he agreed he did not personally hear
or observe Williams threaten her. Jarod, Linett’s son, testified that on January 14,
2009, Williams came to their home looking for Linett, and Williams was armed and
intoxicated. Williams testified and denied that he had been authorized by Dennis to
meet with Linett. 
          Following this hearing, the trial court entered a 14-page protective order, in
which the trial court made numerous findings of fact and conclusions of law. The
trial court found that between November 2003 and January 2004, Dennis had gone
to Linett’s home and threatened her with a gun and that in January 2004 Dennis told
Linett he did not know what would happen to her if she got in his way. The trial
court further found that the shooting incident involving Dennis was substantiated by
the housekeeper’s testimony. 
          In regard to Williams, the trial court found that “it was more likely than not”
that Williams was acting on the instructions of Dennis in contacting and threatening
Linett and her family on several occasions since 2004. For example, the trial court
found that in 2004, Williams went to Linett’s house on behalf of Dennis, offered her
$4 million, told her to keep her mouth shut or she could disappear, and also
threatened to take Linett’s son hunting and have an “accident.” The trial court further
found that in 2005, Williams met with Linett at a restaurant, represented he was there
on behalf of Dennis, and offered to settle the lawsuit. Additionally the trial court
found that on January 14, 2009, Dennis and Williams exchanged multiple phone calls,
and later that evening, Williams went to Linett’s house with a gun looking for her and
that, on January 15, 2009, Dennis made payments to Williams that provided “some
evidence of a quid pro quo.” 
          The trial court also found that Dennis’s and Williams’s credibility had been
diminished by their own testimony. The trial court found Dennis’s testimony that
Williams was a better friend of Linett’s than of Dennis’s had diminished Dennis’s
credibility especially since there was “clear evidence that Dennis Wilkerson sees Mr.
Williams at least weekly and Linett Wilkerson did not see him between 2005 and
2009.” The trial court also noted that Dennis agreed that he had never instructed
Williams to refrain from contacting Linett after learning of Williams’s visits. The
trial court further noted that Dennis’s demeanor in the courtroom showed that Dennis
considered the encounters between Williams and Linett as “no big deal.” In regard
to Williams, the trial court determined that his credibility was diminished by his
testimony that he did not know that Linett was attempting to serve him with process.
          The trial court recognized that Linett’s application for a protective order could
have “some component of strategy” to assassinate Dennis’s character and stated that
it “did not take that concern lightly.” The court found, however, that “the potential
for imminent and escalating family violence and threats will continue to exist
between the parties as both lawsuits proceed.” The court concluded that there was
evidence that Dennis “committed, and caused others to commit family violence and
threats on his behalf” and that Dennis was “likely to commit such family violence in
the future.” In regard to the relationship between Dennis and Williams, the trial court
stated,
          The court is aware of contentions by [Dennis’s] counsel that
[Williams] is not a family or household member. However, this Court
finds as a matter of law that [Dennis] should not be permitted to avoid
being subject to a protective order by causing another person to commit
family violence or make threats on his behalf. This would seem to be
counter to the public policy behind the Family Code protective order
scheme.
 
          Thus, the trial court ordered that Dennis be prohibited from committing family
violence or from having any person, including Williams, commit family violence on
his behalf, from communicating with Linett or her children, and from going to or near
Linett or her children. The trial court subsequently conducted another hearing at
which it received evidence on Linett’s attorney’s fees, and it entered a supplemental
order awarding Linett additional expenses and attorney’s fees.
Standard of Review
          A legal sufficiency challenge to a family violence protective order, like any
other legal sufficiency challenge, may be sustained only when “(1) the record
discloses a complete absence of evidence of a vital fact, (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.”
Clements v. Haskovec, 251 S.W.3d 79, 84 (Tex. App.—Corpus Christi 2008, no pet.).
In reviewing the legal sufficiency of the evidence, a court must consider the evidence
in the light most favorable to the finding and indulge every reasonable inference that
would support it. City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). If the
evidence allows only one inference, neither the trier of fact nor the reviewing court
may disregard it. Id. However, a reviewing court cannot substitute its judgment for
that of the trier-of-fact, so long as the evidence falls within the zone of reasonable
disagreement. Id. Moreover, the trier-of-fact is the sole judge of the credibility of the
witnesses and the weight to be given to their testimony. Vongontard v. Tippit, 137
S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.). We will not
substitute our judgment for that of the trial court merely because we might reach a
different conclusion. Id. 
Applicability of a Family Violence Protective Order
          In his first issue, Dennis asserts that this case is not an “appropriate case” for
the issuance of a family violence protective order. In a portion of his brief entitled
“preface,” Dennis asserts that “Title 4 of the Family Code was enacted to provide a
prompt and efficient way to obtain a court order . . . without having to institute
divorce proceedings,” “the relationship between Linett and Dennis stretches the
statutory definition of family to its outer limits,” “family violence cases almost always
involve members of the same household,” “Linett and Dennis have never shared a
household,” and Linett’s application “is based on her attenuated relationship to
Dennis as his father’s third wife.”
          “With regard to family violence under Section 71.004(1) . . . , an adult member
of the family or household may file an application for a protective order to protect the
applicant or any other member of the applicant’s family or household.” Tex. Fam.
Code Ann. § 82.002 (Vernon 2008). “‘Family’ includes individuals related by
consanguinity or affinity, as determined under Sections 573.022 and 573.024,
Government Code.” Id. § 71.003. “Two individuals are related to each other by
consanguinity if: (1) one is a descendant of the other; or (2) they share a common
ancestor.” Tex. Gov’t Code Ann. § 573.022(a) (Vernon 2008). “Two individuals
are related to each other by affinity if: . . . (2) the spouse of one of the individuals is
related by consanguinity to the other individual.” Id. § 573.024. “The ending of a
marriage by divorce or the death of a spouse ends relationships by affinity created by
that marriage unless a child of that marriage is living, in which case the marriage is
considered to continue as long as a child of that marriage lives.” Id. 
          Under the plain terms of the Family Code, Linett and Dennis are related by
affinity and Dennis and Linett’s four children, all of whom are also Dennis’s half-brother and half-sisters, are related by consanguinity. Dennis does not cite any
authority allowing this Court to judicially narrow the types of relationships to which
a family violence protective order may apply. Accordingly, we hold that Linett was
entitled to seek a family violence protective order for both herself and her four
children.
          We overrule Dennis’s first issue, to the extent that he challenges the
“appropriateness” of the family violence protective order based upon his relationship
with Linett and his four half-brothers and half-sisters. 
Sufficiency of the Evidence
          In his third and fourth issues, Dennis asserts that there is legally insufficient
evidence to support the trial court’s findings that family violence occurred in the past
and is likely to occur in the future.  
           A trial court shall render a family violence protective order “if the court finds
that family violence has occurred and is likely to occur in the future.” Tex. Fam.
Code Ann. § 81.001 (Vernon 2008); see also id. § 85.001(b). The Texas Family
Code defines “family violence” as follows:
an act by a member of a family or household against another member of
the family or household that is intended to result in physical harm, bodily
injury, assault, or sexual assault or that is a threat that reasonably places
the member in fear of imminent physical harm, bodily injury, assault, or
sexual assault; . . .
 
Id. § 71.004(1)(emphasis added). In the present case, our focus is on evidence
regarding threats made by Dennis or anyone acting on his behalf that placed Linnet
and her children “in fear of imminent physical harm, bodily injury, assault” and the
likelihood that such threats, if made, would reoccur in the future. See id.
          Linett testified that, in late 2003, shortly after Jim’s death, Dennis had become
furious during a meeting at her house when Linett informed him that she intended to
audit the family businesses. Dennis had Linett follow him outside, where he pulled
out a gun and shot a number of cans. Dennis then told Linett, “I never miss,” and
Linett felt threatened that Dennis could cause bodily harm to her and her children. 
Linett also stated that she felt Dennis was going to kill her during this encounter. 
According to Linett, Dennis then showed Linett that his glove compartment in his
truck was full of ammunition in order to illustrate to her that he always had
ammunition. Linett’s testimony provides some evidence that Dennis threatened to
shoot her if she continued her attempts to get involved in the family businesses. 
Moreover, Dubon, testified that she saw Linett and Dennis by the gazebo, Dennis
went toward the refrigerator, Dennis fired a small gun, and there were four gun shots. 
Dubon saw Linett inside the home crying and she discovered four cans in the yard
with holes in them. She recalled that later the children picked up shells from the
gunshots and put them in a jar in the kitchen. Dubon’s testimony supported Linett’s
version of events and contradicted Dennis’s version of events. 
          We recognize that Dennis testified that he never threatened Linett with a gun,
and Dennis hotly contested at the hearing what had actually occurred. Dennis also
hotly contests this evidence on appeal. As Linett emphasizes, however, the trial court
could have believed Linett rather than Dennis, in part based upon Dubon’s testimony
and in part based upon possible inconsistencies between Dennis’s deposition
testimony and his trial testimony regarding the shooting incident.


 In sum, we
conclude that the trial court, as the trier of fact, was entitled to believe Linett’s
testimony and find that Dennis threatened to shoot her with a gun if she pursued
involvement in the family businesses.
          Linett also testified that during 2004, while she was working at Augusta Pines,
Dennis told her that he was the one in charge, she should not get in his way, and if
she did, something would happen to her. Linett further testified that Dennis had
threatened her over nine times with bodily injury while she was at Augusta Pines. 
Dennis argues that Linett’s testimony shows only some “non-violent” and verbal
statements to encourage Linett to leave. Dennis also emphasizes the inferences that
could be drawn from contrary evidence showing that Linett never called the police
and that she continued to come to Augusta Pines even after these alleged threats. We
agree that the trier of fact could have considered this evidence in determining whether
Dennis’s threats reasonably placed Linnet in fear of imminent physical harm. 
However, the court could have additionally taken into consideration Linett’s
explanation that she did not notify law enforcement because she did not want to
expose her children to negative knowledge about their half-brother, that her position
as executor required her to go to Augusta Pines and that she felt less threatened when
in the presence of other Augusta Pines employees.
          We also agree that some of Linett’s testimony regarding alleged threats by
Dennis to exclude her from the office, standing alone, might be fairly considered as
“non-violent” statements. As mentioned above, however, according to Linett, nine
of these threats involved “bodily injury.”


 The trial court could have determined that
this testimony, which referenced a specific number of threats of “bodily injury,” was
sufficiently specific to support a family violence finding. Finally, we note that the
trial court could have considered the alleged threats at Augusta Pines in context and
determined, based upon the evidence of Dennis’s threats with a gun in 2003, that
these additional threats reasonably placed Linett in fear of imminent physical harm,
bodily injury, and assault. See Ulmer v. Ulmer, 130 S.W.3d 294, 300 (Tex.
App.—Houston [14th Dist.] 2004, no pet.) (reviewing sufficiency of evidence to
support family violence protective order and noting that specific threats should be
analyzed by considering record in its entirety). Accordingly, we conclude that the
trial court could have found that Dennis continued to threaten Linett with bodily
injury while Linett was at Augusta Pines and that these threats reasonably placed
Linett in fear of imminent physical harm, bodily injury, or assault.



          Regarding the evidence of the specific threats made from 2005 to 2009 by
Williams, allegedly on behalf of Dennis, the trial court made extensive findings. 
First, the trial court found that Dennis’s and Williams’s credibility had been
diminished by providing testimony that was inconsistent and contrary to “clear
evidence.” Second, the trial court found that “it was more likely than not” that
Williams was acting on Dennis’s behalf “in contacting and threatening [Linett] and
her family on several occasions since 2004.” The trial court based these findings
upon Williams’s, Dennis’s, and Linett’s testimony, which we detail below.
          At trial, Linett testified that Williams came to her house two times in 2004. On
the second visit, Linett testified that he threatened her life and the lives of her
children and he made an offer of $4 million to keep her “mouth shut” and never return
to Augusta Pines. She further testified that Williams told her during this visit that
“Dennis sent him over.” Dennis did not object to this testimony. After telling her
that he was there on behalf of Dennis, Williams told Linett that “anything” could
happen to her and that she could disappear and no one would know. Williams also
suggested that her children could be involved in a hunting accident. Williams agreed
that he went to Linett’s house after learning from Dennis that Linett had filed the
underlying lawsuit. Williams claimed that he encouraged Linett not to proceed with
the lawsuit, and he denied threatening Linett or her children. He also denied meeting
with Linett on behalf of Dennis.
          Linett further testified that, in 2005, shortly after having been granted a TRO 
to secure records necessary to fulfill her duties as executor of Jim’s estate, Williams
asked for another meeting. At this meeting, Williams again told her that he was
meeting with her on behalf of Dennis in the capacity as a mediator. This time, Dennis
objected to Linett’s testimony regarding Williams’s representation that he was
appearing on behalf of Dennis. Linett stated that at this meeting Williams offered $10
million to settle the lawsuit, and Williams indicated the lives of Linett and her
children were at stake. Linett also explained that she had arranged for her private
investigator to be present in the restaurant during this meeting because she felt that
her safety was going to be “jeopardized” by Williams. The investigator testified and
corroborated Linett’s testimony that she asked him to accompany her to this meeting
because of safety concerns. Williams agreed that the meeting took place, but he
described the meeting as cordial and denied threatening Linett. He further explained
that he was meeting to help Linett and to fulfill a promise he had made to Jim to
provide guidance to Linett on business matters. 
          Finally, Linett testified that, on January 14, 2009, she received a call from her
son Jarod telling her that Williams had come to the house late in the evening
intoxicated, with a gun, looking for her. Jarod testified that Williams arrived,
uninvited, after 10:00 at night. He said that Williams drove very slowly up the
driveway, stopped, and “started revving up his engine in a . . . threatening manner.” 
Prior to Williams’s entrance, Jarod hurried to his brother Rushton’s room with a
shotgun and told him “if anything happens, I want you to use it.” Jarod recounted
that, upon entering, Williams asked if his mother was at home and continuously
patted the gun in his pants. Jarod tried “not to do anything that would make him
want to use [the gun]” and tried to act as a “barrier”so that Williams couldn’t go any
further into the house. Williams eventually left. Jarod testified that he felt threatened
and he felt that his mother, his brother and his younger sisters were being threatened. 
Rushton, Jarod’s brother, testified that on the night in question, he was sleeping and
Jarod rushed into his room and told him to get the shotgun ready. Rushton also
testified that Jarod told him that Williams had his hand on his gun while in the house. 
          Williams agreed that he went to Linett’s house around 11:00 at night after he
“heard at the [Augusta Pines] office that they were going to mediation.” Williams 
claimed that his intention was to tell Linett that she could “make a deal.” Williams
admitted that he went to Linett’s house after having “some beers on the golf course”
while playing with Dennis that day and then having a couple of glasses of wine at a
restaurant near Linett’s house. Williams also admitted to speaking on the phone two
times with Dennis from the restaurant before going to Linett’s house uninvited,
although Williams stated that he was setting up another golf game with Dennis and
not discussing Linett or the lawsuit.
          Making all inferences in favor of the trial court’s finding, as we must, we
conclude that there is legally sufficient evidence to support the trial court’s finding
that Williams met with and threatened Linett and her family on behalf of Dennis. As
noted above, Linett testified Williams told her during their meetings in 2004 and
2005 that he was meeting with Linett on behalf of Dennis. Even if a portion of
Linett’s testimony regarding the 2005 meeting should have been excluded on hearsay
grounds,


 Dennis did not object to Linett’s testimony regarding the 2004 meeting. 
Moreover, Williams himself testified that he went to Linett’s house in January 2009
after hearing about the mediation at the Augusta Pines office, playing golf with
Dennis that day, and speaking with Dennis on the phone two times. The trial court
was presented with sufficient evidence to conclude that beginning in 2004 through
2009 Williams continued to communicate with Linett regarding the lawsuit on behalf
of and with the knowledge of Dennis.


 
          In sum, we hold, based upon the evidence of the continually escalating threats
made by Dennis and the threats made by Williams on Dennis’s behalf, involving the
threat of the use of deadly force against Linett and her children if Linett continued to
pursue involvement in the family businesses and the underlying lawsuit, culminating
in Williams’s late night visit in which Jarod felt frightened enough to load the
shotgun to protect his siblings, that there is legally sufficient evidence to support the
trial court’s finding that family violence occurred in the past. We similarly hold,
based upon the history of the threats made by Dennis and by Williams on Dennis’s
behalf, spanning from 2003 to 2009, that there is legally sufficient evidence to
support the trial court’s finding that family violence is likely to occur in the future as
the underlying lawsuit proceeds. See Clements, 251 S.W.3d at 87 (holding that
evidence of a pattern of family violence in past can support a finding that family
violence will likely occur again in the future).


 We specifically note that the evidence
of family violence in this case was tied directly to the fact that Linett is pursuing the
underlying lawsuit against Dennis, that each threatening incident occurred following
a critical juncture in the proceeding, and that the family violence protective order was
entered in April 2009, following the conclusion of an unsuccessful mediation and the
anticipation of setting a trial date. Hence, we find very persuasive the finding by the
trial court that the potential for imminent and escalating family violence will continue
to exist as the lawsuit proceeds.
          We overrule Dennis’s third and fourth issues.
Evidentiary Complaints
          In his second issue, Dennis asserts that a family violence protective order
cannot “survive appellate scrutiny when it is based on argument, innuendo and
inadmissible evidence.” Dennis specifically contends that the trial court erred in
admitting certain evidence and that the cumulative effect of the trial court’s
evidentiary errors renders the evidence insufficient.
          First, Dennis complains that the trial court erred in admitting a portion of
Linett’s testimony on the ground of hearsay. However, as explained above, Dennis
failed to object on at least one occasion to Linett’s testimony that Williams was
meeting with Linett on behalf of Dennis. We also note that Linett argues that her
testimony regarding Williams’s representations that he was meeting with her on
behalf of Dennis was admissible because Williams was a named party to Linett’s suit
seeking a protective order and Williams was Dennis’s agent and co-conspirator. See
Tex. R. Evid. 801(e)(2)(D) (providing that “a statement by the party’s agent or
servant concerning a matter within the scope of the agency or employment, made
during the existence of the relationship” is admission by party-opponent and is not
hearsay); Tex. R. Evid. 801(e)(2)(E) (providing that “a statement by a co-conspirator
of a party during the course and in furtherance of the conspiracy” is an admission by
party-opponent and is not hearsay).


 However, we need not directly address the
admissibility of the challenged portion of Linett’s testimony regarding Williams’s
representations during their 2005 meeting because we conclude that Linett’s
testimony, to which Dennis did not object, together with the circumstantial evidence
cited by the trial court in its family violence protective order, was sufficient for the
trial court to conclude that Williams was meeting with Linett on behalf of Dennis.
          Second, Dennis complains that the trial court erred in admitting evidence
related to his 30-year-old misdemeanor convictions arising from conduct committed
when he was 17 years old, with no evidence of intervening conduct. Dennis asserts
that these convictions were inadmissible under Texas Rules of Evidence 404 and 609. 
          The trial court relied upon evidence of these misdemeanor convictions to make
the following finding of fact and conclusion of law:
2.First, the Court finds that [Dennis] has exhibited a history of
violent and threatening behavior. He is now a 48 year old man and a
father. As a teenager in the late 1970’s he was convicted of shooting an
individual with a shotgun. Of note, the Court finds that the shooting
occurred after other persons apparently shot and otherwise damaged his
vehicle, and Dennis claims to have been acting in retaliation. [Dennis]
was also convicted of falsely imprisoning a young woman as a teenager.
[Dennis’s] counsel argued strenuously that this evidence was irrelevant
to the proceedings and also inadmissable under Texas Rule of Evidence
609. . . . This Court finds that the nature of the past crimes is relevant
to the issues before this Court because they involve guns, as do the
threats in this case, because they involve retaliation, as does this case,
and because they involve violence towards women, as does this case. 
For the same reasons, the Court finds that the convictions are not
excluded by Texas Rule of Evidence 403, . . . .
 
          In his reply brief, Dennis notes that during the hearing, the trial court stated
that it considered the evidence related to Dennis’s criminal history to be “very
significant.” Dennis then argues that because the trial court stated in paragraph 2 of
the family violence protective order that it based its ultimate findings of family
violence on the “foregoing,” the admission of Dennis’s prior criminal records was not
only improper, but also harmful.
          Assuming that the trial court erred in admitting evidence pertaining to Dennis’s
1970’s misdemeanor convictions because such evidence was irrelevant to the issue
of family violence or because such evidence constituted inadmissible character
evidence, see Tex. R. Evid. 404(b), we disagree with Dennis’s contention that
“critical fact” findings necessary to support the family violence protective order must
be set aside and that, as a result, the evidence is legally insufficient. We recognize
that the trial court stated in paragraph 2 that the evidence showed, among other
things, a history of violent and threatening behavior. However, paragraph 2 was only
one paragraph in a 14-page protective order that was extremely detailed. The
overwhelming majority of the trial court’s fact findings in its 23 paragraph order
concerned the testimony regarding the specific threats made between the parties. Our
review of the record also reveals that, although Linett and her counsel placed some
emphasis on Dennis’s criminal history and vigorously argued for its admission, the
overwhelming majority of the witnesses and testimony concerned the alleged threats
made by Dennis, Williams, and Linett from 2003 to 2009.


 Accordingly, we cannot
conclude that any of the complained-of evidentiary errors committed by the trial court
probably caused the rendition of an improper judgment. See Tex. R. App. P. 44.1. 
          We overrule Dennis’s second issue.
Attorney’s Fees
          In an issue presented in a supplemental brief, Dennis contends that “if the
family violence protective order is reversed on appeal,” the trial court’s order
awarding attorney’s fees to Linett must also be reversed. Dennis does not present any
other substantive challenge to the attorney’s fees award. Having held that sufficient
evidence support’s the family violence protective order, we hold that the attorney’s
fees award should not be reversed.
          We overrule Dennis’s issue raised in his supplemental brief.
 

Conclusion
          We affirm the order of the trial court.
 
 
                                                                        Laura Carter Higley
                                                                        Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Justice Jennings, dissenting.