**Affirmed and Memorandum Opinion filed May 17, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00429-CV

---

### JOHN MICHAEL DALBOSCO, Appellant

### V.

### MELISSA RUTH SEIBERT, Appellee

---

**On Appeal from the 328th District Court
Fort Bend County, Texas
Trial Court Cause No. 11-DCV-187,542**

---

## M E M O R A N D U M   O P I N I O N

This is an appeal from a protective order entered against John Michael Dalbosco after the trial court determined that he committed family violence against Melissa Ruth Seibert, and that he was likely to commit family violence in the future. Dalbosco contends that (1) the trial court erred by denying his motion for directed verdict; and (2) there is no evidence in the record that family violence is likely to occur in the future to support the trial court granting a family violence protective order. We affirm.

## Background

Seibert applied for a family protective order against Dalbosco on February 9, 2011, alleging that Dalbosco engaged in conduct that constitutes family violence. The trial court held a hearing on Seibert's application for protective order on April 18, 2011.

At the hearing, Seibert testified that she met Dalbosco in May 2010. Dalbosco, Seibert, and her two sons moved into a house together in June 2010. Dalbosco and Seibert got engaged in August or September 2010; they have no children together. Seibert testified that Dalbosco began assaulting her in October 2010.

### The October 22, 2010 Incident

Seibert testified that one day in mid-October she and Dalbosco argued about finances and about a young man named Jimmy who was living with them in the house. Seibert stated that Dalbosco wanted to leave after the argument. When Seibert asked Dalbosco to not leave, Dalbosco started "yanking on" Seibert and "getting rough" with her. Dalbosco "shoved [Seibert] in and out" of his truck. According to Seibert, Dalbosco pushed her and she fell on the ground. She stated "it was just rough, the whole thing." Seibert testified that she did not call the police that night because she did not want to cause any problems for Dalbosco and his family and she "wanted things to work out."

### The October 24, 2010 Incident

Seibert testified that two days later Dalbosco had "really assaulted [her] to the point where [she] had to do something about it." Seibert testified that she and Dalbosco had gone to dinner with friends earlier in the evening. When they returned home, Dalbosco went to the garage to continue drinking and smoking with Jimmy; Seibert went to bed. Seibert testified that she was asleep when Dalbosco woke her up and demanded that she tear up a picture of her ex-husband she was keeping for her two sons. When Seibert refused to tear up the picture, Dalbosco told Seibert to get out of his house and dragged her out of the bed. Seibert thought Dalbosco would drag her out of the house because he had done it before. Because she did not want to be dragged out in her

2

nightgown, Seibert "pushed [her]self in the corner."

Dalbosco then "started pretty much full fist, full force punching [Seibert] in the face, head wherever." When Seibert asked Dalbosco if he was crazy, he pulled out a little knife and said, "you don't want to fuck with me." Seibert testified that she was very scared so she started calming down Dalbosco and then ran into the bathroom. She grabbed an Oxiclean spray bottle and sprayed the "Oxiclean towards [Dalbosco's] face." Seibert and Dalbosco continued arguing in the bathroom and "when everything just calmed down," Seibert ran to her neighbors Terrel and Debbie's house for help.

Seibert testified that she was terrified and shaking, and she believed Dalbosco was going to kill her. Terrel called the police, and three police officers arrived. Seibert testified that she sustained injuries to her face, head, back and arms, and Seibert's finger was dislocated when Dalbosco punched her. Seibert admitted she had been drinking the night of the incident and taken Prozac, which her doctor had prescribed for post partum depression. She denied having taken Clonopin — another prescription drug.

Seibert's neighbor Terrel recalled the October 24 incident and testified that Seibert came to his home and was "rather upset, screaming and appeared to be hurt." Seibert told Terrel that she had been beaten so he called the police. Terrel testified that Seibert "had hemorrhaging under the eye, black eye. Other facial marks, arm bruising, leg bruising." Terrel stated that Seibert had been drinking at his house earlier in the evening. Seibert was "[i]ntoxicated enough to fall over an ottoman and virtually stand still in that position;" Terrel stated he was "utterly concerned about her at the time."

Detective Shady Elsabie testified that he responded to "a disturbance with possible weapon" call in the early morning hours of October 24, 2010. He interviewed Seibert who told him that she and Dalbosco had an argument. Elsabie stated that Seibert was "crying a lot" and that she had scratches near her eyes, on her face, knees and arm, and bruises on her body. He stated that her blouse was torn as if "someone just ripped it." He also observed a large bruise on her arm that appeared to be "a couple of days old." He took photos of Seibert's injuries; the photos were admitted into evidence and showed

3

scratches underneath Seibert's eyes and on her knees and bruises on her arms, leg, and breast. According to Elsabie, Seibert did not appear to be drunk or on medication.

Elsabie also testified that he observed Dalbosco lying on the kitchen floor when he arrived at the house. According to Elsabie, Dalbosco was not arrested because he was lying on the ground; he was not in his right state of mind; he was disoriented; he would not get up; he "barely could open his eyes, barely could provide any statements;" and "it seemed like he needed to go to the emergency room which is priority."

An ambulance took Dalbosco to the hospital. Dalbosco's mother, Vera, testified that his eyes had to be flushed at the hospital. Seibert testified that Dalbosco later told her that he went to the hospital because "he just didn't want to go to jail."

*The November 2010 Incident*

Seibert testified that she and Dalbosco were arguing one day in November 2010. To get away from the argument, Seibert went into the bedroom and locked the door behind her. Dalbosco kicked in the door, "put his hand behind his back and chest butted" Seibert. Seibert reached out her hand to talk to Dalbosco but he bit her hand and spit in her face. Seibert testified that it hurt when Dalbosco chest-butted and bit her. She did not call the police because she did not want to cause trouble for him or his family. Seibert stated she called Dalbosco's mother because she is the only one who can calm Dalbosco down.

*The January 30, 2011 Incident*

Seibert testified that she went to Terrel and Debbie's house to visit; Christopher King, a friend of Terrel and Debbie, also was at the house visiting. Seibert admitted that she had been drinking at her neighbors' house. She returned home around midnight and saw Dalbosco smoking in their garage. She asked Dalbosco why he did not come over to Terrel and Debbie's house, and Dalbosco replied that he did not know. Dalbosco then asked Seibert to give him the keys to the car she drives to work but she refused to do so because she was worried that she would not be able to get to work if Dalbosco took the

4

car keys away from her. Seibert testified that Dalbosco shut the garage door behind her so she was "trapped" in the garage. She stated that Dalbosco kept her in the garage for two hours "and he was just real bickering over Jimmy." Seibert was exhausted and offered to give Dalbosco the car keys if he let her "go lay down and go to sleep on the couch." As she was walking into the house, Dalbosco grabbed Seibert's hand to get the keys but she managed to leave the house with the keys in hand. Seibert testified that she was screaming for help while Dalbosco was pulling her hair and hitting her to get the keys. Seibert testified that Christopher heard her screaming and came over to help. Christopher had a gun and pointed it against Dalbosco's back; later, the police arrived.

Christopher testified that he was asleep when he heard calls for help. He got dressed and went outside armed with his gun in his pocket. He realized that Seibert was screaming as she was lying on the ground clutching her purse and Dalbosco was pulling her shirt. Dalbosco was yelling at Seibert and it appeared as if Dalbosco was about to strike Seibert. After Christopher repeatedly told Dalbosco to let go of Seibert, Dalbosco let her go. Seibert ran to Debbie and Terrel's house. Christopher repeatedly asked Dalbosco to go inside the house. After Dalbosco entered the house, Christopher called the police. Christopher testified that Seibert was "extremely shook up. She was sobbing. She was disheveled. It looked like she had been wrestling around a little bit. Her clothes all pulled out. Her hair all messed up." He also testified that Seibert had been drinking at Debbie and Terrel's house earlier in the evening but Seibert was not drunk when she left the house around midnight.

Dalbosco's mother, Vera, testified that Seibert and Dalbosco came to Vera's house after the January 30 incident to let Vera know that they would "separate for awhile because things were just not working out and [Seibert] was going to move out." Vera testified that Seibert told her that she had a relapse on January 30, and that she had taken prescription medications and got drunk. Vera stated that Seibert had insisted on coming to Vera's house to make a recording of what had happened on January 30. The trial court admitted the recording of Seibert and Vera's conversation regarding the January 30

5

incident.  On the tape, Seibert stated that she had a relapse on January 30 and took too much of her prescription medication and drank hard liquor.  She was upset "about the whole Jimmy thing" and "felt negative."  She told Vera that she was not herself because she mixed alcohol and pills and that she did not remember much about the night.  Seibert told Vera that she remembered sitting in the garage for two hours; that Dalbosco trapped her in the garage; that he "pulled and yanked on her," chased and grabbed her to take her car keys from her; and that she fell.  Seibert stated that she did not remember "a lot of things" she said that night.  She admitted to making "the mistake of mixing alcohol and pills" and that Dalbosco did not know that she had mixed pills with alcohol.

It is unclear from the recording whether Dalbosco was present throughout the entire recording because he participates in parts of the conversation.  With regard to the recording, the trial court stated: "Ms. S[ei]bert is apparently aware that he was on the tape and that will impact the credibility of her testimony from my perspective."

*The February 2, 2011 Incident*

By February 2, 2011, Seibert and Dalbosco had "broken up" but Dalbosco agreed to drive Seibert to work and her son to school until she could find a new place to live.  Seibert testified that she and Dalbosco started arguing on the way to her son's school on February 2.  After dropping off Seibert's son at school, she asked Dalbosco to drive her to the bank so she could open her own account.  Because it was still early, they were going to wait in front of the bank until it opened.  While waiting for the bank to open, Seibert and Dalbosco continued arguing and Seibert told Dalbosco to take her home.  Dalbosco refused to take her home; instead, he drove her to his parents' home in Cinco.

Seibert and Dalbosco sat in Dalbosco's truck for about an hour and a half arguing.  Seibert testified that Dalbosco grabbed her a few times when she attempted to exit his truck; he verbally threatened her and called her names.  Seibert testified that Dalbosco exited the truck and "went to the back of his truck . . . where he keeps his guns."  She then "jumped out of the truck," called 911, and "fled from his parents' house."

6

Seibert testified that she did not see Dalbosco after the February 2 incident. According to Seibert, her "last dealing with" Dalbosco was when he came to her house one day in February when her cousin and son were at home. As instructed by the police, Seibert called 911 and the police arrived at the house. Soon thereafter, Seibert applied for a protective order.

Seibert testified that Dalbosco's family e-mailed her family members and that Dalbosco e-mailed her ex-husband. She testified that she applied for a protective order because Dalbosco assaulted her numerous times and she is "worried about him coming back" and "worried about future violence from him." Seibert testified that she is afraid of Dalbosco because he threatened her in the past and told her that "if [she] ever took him to court, that [she] would regret it." Seibert stated that his threat "could mean anything."

Seibert acknowledged that Dalbosco abided by the temporary protective order since it has been in place. She also stated that Dalbosco does not work close to her place of work and that she is not expecting a child with him.

The trial court signed a family violence protective order on April 18, 2011, finding that family violence had occurred and that family violence is likely to occur in the foreseeable future. Dalbosco filed a timely notice of appeal.

## Analysis

In his first issue, Dalbosco argues that the trial court erroneously denied his motion for directed verdict because "no evidence was offered to support a finding that family violence is likely to occur in the future."

Texas law is well settled that a defendant who moves for a directed verdict after the plaintiff rests, but thereafter elects not to stand on his motion for instructed verdict, and proceeds with his own case, waives his motion for directed verdict unless the motion is reurged at the close of his case. *Ratsavong v. Menevilay*, 176 S.W.3d 661, 667 (Tex. App.—El Paso 2005, pet. denied); *see Shows v. Man Engines & Components, Inc.*, No. 14-09-00895-CV, __ S.W.3d __, 2012 WL 902971, at *6 n.13 (Tex. App.—Houston

7

[14th Dist.] Mar. 15, 2012, no pet. h.). Dalbosco waived his complaint by offering evidence in his own case after moving for a directed verdict and not reurging his directed verdict motion at the close of evidence.

Accordingly, we overrule Dalbosco's first issue.

In his second issue, Dalbosco contends that there is "no evidence in the record that family violence is likely to occur in the future to support the trial court granting a family violence protective order."

In reviewing a trial court's findings of fact for legal sufficiency, we apply the same standards that we apply in reviewing jury findings. *Ulmer v. Ulmer*, 130 S.W.3d 294, 299 (Tex. App.—Houston [14th Dist.] 2004, no pet.). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

Under Section 85.001 of the Texas Family Code, the trial court may grant a protective order upon finding that family violence has occurred and is likely to occur again in the future. Tex. Fam. Code Ann. § 85.001(a) (Vernon 2008). In cases involving protective orders against family violence, evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue this behavior in the future. *Teel v. Shifflett*, 309 S.W.3d 597, 604 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Banargent v. Brent*, No. 14-05-00574-CV, 2006 WL 462268, at *1-2 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op.)). "'Oftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order.'" *Id.* (quoting *In re*

*Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.))

Dalbosco argues that Seibert only presented "evidence of minor scratching and bruising that occurred on one incident when she testified she was drinking while taking prescription medication." He contends that Seibert did not allege or present "any evidence of a particularly vicious and disabling physical attack, any pattern of violent behavior, that her life had been threatened or that she was ever in any danger" as was the case in *Teel* and *Banargent*. Dalbosco contends that the present case is analogous to *In re J.A.T.*, No. 13-04-00477-CV, 2005 WL 1981497 (Tex. App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op.), and *Gipson v. Huerta*, No. 13-02-00490-CV, 2003 WL 21666140 (Tex. App.—Corpus Christi July 17, 2003, no pet.) (mem. op.). According to Dalbosco, the court of appeals in *J.A.T.* and *Gipson* reversed the trial court's grant of the protective order "because neither case involved a brutal attack, the repeated acts of violence, or the death threats."

Contrary to Dalbosco's assertion, *J.A.T.* and *Gipson* did not reverse the trial court's protective order "because neither case involved a brutal attack, the repeated acts of violence, or the death threats."

In *J.A.T.*, the court of appeals stated that the "evidence in the record shows that on June 11, 2004, during the exchange of the minor child, appellant pulled appellee, Jessica Alise Pena, toward him when she had the child in her arms, which resulted in the child being pulled between the two parties. *J.A.T.*, 2005 WL 1981497, at *1. "Assuming without deciding that this action constituted 'family violence,' the record contains no evidence that family violence 'is likely to occur in the future.'" *Id.* (internal citations omitted). "Because appellee failed to establish the second element required by section 85.001(a) of the family code, we hold the evidence is legally insufficient to support the trial court's protective order." *Id.*

In *Gipson*, the court stated that "appellee's counsel argued that evidence of future family violence could be found in appellee's affidavit in support of her request for ex parte relief." *Gipson*, 2003 WL 21666140, at *2. "However, appellee's affidavit was

9

neither offered nor admitted into evidence, and appellee did not testify regarding this matter." *Id.* Therefore, the court concluded that the record contains no evidence that violence is likely to occur in the future and reversed the trial court's protective order. *Id.*

Further, neither *Banargent* nor *Teel* held that "vicious and disabling physical attacks," a "pattern of violent behavior," or "death threats" are required before past violence may support a finding of likely future violence. *See Teel*, 309 S.W.3d at 604; *Banargent*, 2006 WL 462268, at \*1-2.

Here, the trial court heard testimony that Dalbosco attacked Seibert in a violent manner on several occasions. Seibert testified that Dalbosco "yanked on" her, was "rough" with her, and "shoved" her in and out of his truck on October 22, 2010. Only two days later, Seibert sustained injuries to her face, head, back, arms, and finger when Dalbosco punched her full fist in the face, head, and other parts of her body. During that incident, Dalbosco also threatened her with a knife. In November, Dalbosco "chest-butted" and bit Seibert. After "trapping" Seibert for two hours in the garage on January 30, 2011, Dalbosco again attacked Seibert because she refused to give him car keys. Seibert testified that Dalbosco pulled her hair and hit her to get the car keys.

On February 2, 2011, Dalbosco kept Seibert in his truck and grabbed her hand when she attempted to get out of the truck. Seibert managed to flee when Dalbosco exited the truck to access the back of his truck "where he keeps his guns." Even though Seibert did not see Dalbosco after the February 2 incident, he and his family e-mailed Seibert's family members; Dalbosco also e-mailed her ex-husband, with whom Seibert is good friends. Seibert testified that she applied for a protective order because Dalbosco assaulted her numerous times; choked and kicked her; and pulled her hair. She stated that she is scared of Dalbosco and is "worried about him coming back" and "worried about future violence from him" because "he is very unpredictable." Seibert testified that she is afraid of Dalbosco because he threatened her in the past and told her that "if [she] ever took him to court, that [she] would regret it." Seibert stated that his threat "could mean anything."

10

Considering that the trial court is the only judge of witness credibility and the weight to give to testimony, we conclude that the trial court reasonably could have concluded that future violence is likely to occur based on the testimony showing a pattern of violent behavior. Under the applicable standard of review, we conclude that the evidence is legally sufficient to support the trial court's finding that Dalbosco is likely to commit violence in the future.

Accordingly, we overrule Dalbosco's second issue.

## Conclusion

We affirm the trial court's judgment.


/s/     William J. Boyce
        Justice


Panel consists of Justices Brown, Boyce, and McCally.

11