**Mark David ULMER, Appellant,**

v.

**Dawn ULMER, Appellee.**

No. 14–03–00125–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 12, 2004.

---

Mack J. Travers, Emanuel Joseph Caiati, Katy, for appellant.

Alan Curry, Houston, for appellee.

En Banc Court consists of Chief Justice HEDGES, Justices YATES, ANDERSON, HUDSON, FOWLER, EDELMAN, FROST, SEYMORE, and GUZMAN.

## EN BANC OPINION

LESLIE BROCK YATES, Justice.

Appellant Mark Ulmer appeals a finding of family violence and the granting of a protective order issued pursuant to Title IV of the Texas Family Code. In one point of error, appellant challenges the legal and

factual sufficiency of the evidence to support the trial court's findings. We affirm.

## I. JURISDICTION

Whether we have jurisdiction over an appeal from a family-violence protective order first came before this court in *Maharaj v. Mathis*, No. 14–97–01329–CV, 1999 WL 111274 (Tex.App.-Houston [14th Dist.] March 4, 1999, no pet.) (not designated for publication). In a plurality opinion, we determined that a protective order is not appealable. *See id.* at *1. We recognized that appellate courts have jurisdiction only over final judgments and interlocutory orders deemed appealable by the legislature. *Id.* We held that a protective order is not a final judgment—and thus is interlocutory—because, during the effective period of the order, the trial court retains the power and jurisdiction to modify the terms of the order. *Id.* We then noted that family protective orders are not among the interlocutory orders expressly granted appellate review by the legislature. *Id.* Hence, we dismissed the case for want of jurisdiction. *Id.* We relied on the *Maharaj* opinion when one of the parties in that case filed a subsequent notice of appeal in an attempt to relitigate the same issue. *See Maharaj v. Mathis*, No. 14–99–00505–CV, 2001 WL 395405, at *2 (Tex. App.-Houston [14th Dist.] April 19, 2001, pet. denied) (not designated for publication). In both *Maharaj* opinions, we relied on the reasoning of the Tenth Court of Appeals in *Normand v. Fox*, 940 S.W.2d 401, 402–403 (Tex.App.-Waco 1997, no writ).

Since that time, the Tenth Court of Appeals has reconsidered its position on this issue and has concluded that family-violence protective orders are final and appealable if they are issued outside of a pending proceeding. *Kelt v. Kelt*, 67 S.W.3d 364, 366 (Tex.App.-Waco 2001, no pet.). In fact, many of our sister courts have addressed this jurisdictional issue and concluded likewise. *See B.C. v. Rhodes*, 116 S.W.3d 878, 881–82 (Tex.App.-Austin 2003, no pet.); *Cooke v. Cooke*, 65 S.W.3d 785, 787–88 (Tex.App.-Dallas 2001, no pet.); *Striedel v. Striedel*, 15 S.W.3d 163, 164–65 (Tex.App.-Corpus Christi 2000, no pet.); *Winsett v. Edgar*, 22 S.W.3d 509, 510 (Tex.App.-Fort Worth 1999, no pet.); *James v. Hubbard*, 985 S.W.2d 516, 518 (Tex.App.-San Antonio 1998, no pet.). Based on our review of these cases and our belief that a protective order issued outside of an ongoing proceeding should be subject to appellate review, we reexamine our prior position.[1]

■ We conclude that a family-violence protective order that gives injunctive relief and disposes of all issues and parties is a final, appealable order. In reaching this conclusion, we agree that an appellate court should examine an order's function—rather than its mere designation—to determine whether it is final or interlocutory. *See Del Valle Indep. Sch. Dist. v. Lopez*, 845 S.W.2d 808, 809 (Tex.1992) (rejecting the "notion that such matters of form control the nature of the order" and finding that "it is the character and function of an order that determine its classification"). Moreover, the ability of the trial court to modify an order should not render it interlocutory. *See Rhodes*, 116 S.W.3d at 881–82. The mere fact that an order may someday be modified does not intimate that the trial court has not finally disposed of the parties and issues. *Id.* at 882. To illustrate, we borrow an analogy used by the Third Court of Appeals. A permanent

---

1. The State joins appellant in arguing that we have jurisdiction over this type of protective order.

injunction that disposes of all issues and parties is considered a final, appealable judgment despite the fact the trial court retains jurisdiction to review, open, vacate, and modify the injunction upon a showing of changed conditions. *Id.* at 881–82. Thus, if a protective order is issued outside of an ongoing proceeding, the trial court is granting injunctive relief and is fully disposing of all parties and issues before it. *See id.* at 881. Hence, the order is final and appealable. All prior statements from this court that are inconsistent with this opinion are disavowed.[2]

## II. BACKGROUND

Appellant and appellee Dawn Ulmer were divorced on December 14, 2001. Shortly after the divorce, appellee went to the City of Houston Police Department ("HPD") to report that appellant had exhibited harassing and threatening behavior towards her. At that time, she did not pursue charges or a protective order. She was satisfied with HPD sending a letter to appellant, which requested he stop all contact with her. Approximately ten months later, appellee filed for the protective order at issue in this case.

Appellee testified at the hearing on her application for a protective order that, during the marriage, appellant was extremely controlling and vengeful. Appellant had repeatedly threatened her life. Specifically, he would tell her that "every person in the country was going to know his name after he got done with [her], and he was going to kill [her] and kill himself." He would constantly tell her "[t]onight is the night" or something to that effect. He

would tell her "he would make sure that the children would find us and knew it was [her] fault...." Appellee was aware appellant owned a shotgun.

On December 26, 2001, appellant demanded a coat of his when he picked up their children. When she told him that he should have gotten the coat when he was supposed to pick up all of his things, he became enraged and shoved her. Appellee ran into the house and tried to shut the door. However, appellant ripped the door open, came into the house, said he was going to get the coat, and told her that every threat he had made against her was going to come true. Appellant said that appellee would not know when it was going to happen, but that he was patient and would wait. Appellee reported this incident to the police. The police sent a warning letter to appellant, but after a time, he continued the stalking and harassing behavior.

After the divorce, appellant started routinely showing up at their eldest son's soccer games and verbally assaulting appellee in front of other people. At one practice she attended with her boyfriend, appellant verbally assaulted them both. When their youngest son gave appellee's boyfriend a hug, appellant grabbed the boy, took him away, and started yelling that the boyfriend was a bad man. Appellee had asked appellant not to attend their son's soccer or baseball practices because appellant had on prior occasions yelled at her in front of the children and in front of other people who were there. Appellant

---

**2.** We note our reconsideration of the court's jurisdiction over this type of protective order would not have changed the outcome in the *Maharaj* case. The concurrence in the first opinion noted that the protective order at issue was filed after appellee had filed a motion to modify the parent-child relationship.

*Maharaj,* 1999 WL 111274, at *2 (Fowler, J., concurring). Because that order was issued during the pendency of such a suit, all issues between the parties had not been decided, and the order was not final. Thus, it was not appealable.

refused, saying that he could do whatever he wanted—appellee could not stop him.

At the hearing, appellee discussed behavior directed towards her boyfriend that made her believe appellant is still obsessed with her. Appellee's boyfriend, John Thomas, is an associate pastor at Gloria Day Lutheran Church ("Gloria Day"). This is the church the parties attended during their marriage. Appellant contacted Thomas's supervisor to complain about the relationship between appellee and Thomas, sent a letter to the Lutheran church officials complaining about the relationship, and put flyers on cars in the Gloria Day parking lot complaining about Thomas.

Appellee also testified to many miscellaneous acts she said have made her more afraid of appellant since December of 2001. Once when she and the children were visiting Thomas's house, she noticed appellant was parked outside in his truck; when she saw his face, he drove away. Appellant called her later that night. Appellee has not been to Thomas's house since that evening. Appellee, a school teacher, also testified appellant has shown up at her classroom without reason on about five occasions, and on a couple of occasions, tried to get into an argument while her students were at their desks doing their work. On September 19, 2002, appellant came to the school where she teaches, looking for a soccer ball that was in her vehicle. Appellee was later told by more than one person that appellant had been looking for her; his visit frightened her. Appellant became very upset when one of the boys gave appellee a hug before he left school with appellant—appellant then told the child that he was not allowed to do that anymore. The child did hug appellee on another occasion, and appellant began yelling. The outburst made a couple of the children who were in the school office cry.

Appellee testified that since the incident at her house in December of 2001, things have escalated and she is afraid appellant is about to "snap." Appellant calls her, e-mails her, and harasses people she knows. Appellee has informed her neighbors of the situation, installed an alarm system, changed the locks on her doors, and gotten a dog.

Officer Leonard Dawson, who interviewed appellee when she went to HPD shortly after the divorce, also testified at the hearing. Appellee reported to him the details of the December 2001 incident. Appellee seemed distressed and said she feared for her safety and for the safety of her children. Officer Dawson acknowledged that, during the interview, appellee mentioned financial difficulties she was having and discussed that she worked two jobs. Appellee indicated she did not wish to pursue charges. Officer Dawson testified appellee seemed credible and he had no reason to doubt what appellee was telling him, but he felt there was not probable cause to support charges at that time.

Linda Fouty testified that appellee called her on December 26, 2001, and told her appellant had pushed her, was in the house, was yelling, and would not leave. Appellee told Fouty she was very scared. Fouty got in her car and drove to appellee's house, but by the time she got there—about five minutes later—appellant was gone. When she got to the house, the furniture was in place and there were no signs of a struggle. She said appellee was crying, shaking, and appeared frightened. Fouty admitted she did not like appellant.

Jill Arnold testified she was at the school when appellant showed up on September 19, 2002. Appellant was standing outside of the school with two boys and asked Arnold if she taught with appellee. Appellant asked Arnold to go inside the school and find appellee because the boys

needed their soccer ball out of appellee's car. After being informed appellee had left the school to go to dinner with another teacher, Arnold relayed that information to appellant. Arnold believed she only left appellant alone for about a minute to a minute-and-a-half when she went inside the school. Appellant kept telling Arnold that appellee's car was at the school. Appellant waited around for a couple of minutes and then drove off. Arnold testified appellant's behavior seemed normal, and he did not appear angry.

Appellant testified at the hearing and disputed most of appellee's testimony. He said he had not committed violence against his ex-wife, and had never threatened violence against her or anyone else. Further, he had no intention of doing so in the future. He admitted to telling his brother that he had told his ex-wife he was going to kill himself, and had said everyone would know his name. Appellant said he made those comments prior to the divorce, and he did not have an intent to follow through on them. Appellant said that on December 26, 2001, he did not threaten appellee, did not shove her, and did not enter her house. Appellant denied that on September 19, 2002, he spoke to anyone other than Arnold about appellee or the soccer ball. Appellant said that on September 20, 2002, he grabbed his child away from Thomas and called Thomas a bad man. Appellant testified he did not repeatedly yell at appellee; he just spoke to her in a stern voice. Appellant said he did not park outside of Thomas's house—the assistant coach of one of his boys' soccer teams happens to live on the same street as Thomas. Appellant testified appellee has constantly threatened to call the police on him when he does innocent things, like dropping things off at the school.

Appellant said he attended Gloria Day before and after the divorce, and on one occasion spoke with Thomas about the divorce. Appellant could not recall whether Thomas actually counseled him or gave him referrals to other counselors. He admitted he became angry when he found out Thomas and appellee were dating. Appellant said he e-mailed and spoke with the senior pastor to express his displeasure. He then wrote a letter to the president of the Synod of Lutheran Churches to express his concerns. Appellant acknowledged making the flyer about Thomas, but said he only made one copy of it, and placed it on only one car in the church parking lot.

## III. Sufficiency of the Evidence

■ At the conclusion of the hearing, the trial court found that appellant had committed family violence and that family violence was likely to occur again in the future. In his sole point of error, appellant contends the evidence is legally and factually insufficient to support the trial court's findings.

■ In reviewing a trial court's findings of fact for legal and factual sufficiency, we apply the same standards that we apply in reviewing jury findings. *Johnston v. McKinney American, Inc.,* 9 S.W.3d 271, 276 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). In considering legal sufficiency, we view the evidence in a light that tends to support the disputed findings and disregard all evidence and inferences to the contrary. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). If more than a scintilla of evidence exists, it is legally sufficient. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.* at 782–83. In reviewing factual sufficiency, we examine the entire record, considering both the evidence in favor of, and

contrary to, the challenged findings. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside a fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Cohn v. Comm'n for Lawyer Discipline,* 979 S.W.2d 694, 696 (Tex.App.-Houston [14th Dist.] 1998, no pet.). We will not substitute our judgment for that of the trial court merely because we might reach a different conclusion. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Cohn,* 979 S.W.2d at 696.

The Family Code defines family violence as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is *a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault,* but does not include defensive measures to protect oneself." TEX. FAM.CODE ANN. § 71.004(1) (Vernon 2002) (emphasis added). The trial court determined that—in the context of the previous threats to kill appellee—many acts of appellant constituted family violence such as appellant's going to appellee's residence after the divorce, appellant's showing up at appellee's place of employment, appellant's calling appellee on her cellular phone, and appellant's expressions of anger and yelling. The trial court also found that such violence was likely to continue.

Appellant argues that there is no evidence showing that (1) appellant acted with the intent to cause physical harm, bodily injury, or assault; or (2) appellant's actions did result in physical harm, bodily injury, or assault; or (3) appellant made any threat that reasonably placed appellee in fear of imminent physical harm, bodily injury, or assault. Appellant emphasizes that, at one point in her testimony, appellee answered affirmatively to a question asking if the last threatening thing appellant did to her was on December 26, 2001. While the excerpt from the reporter's record is accurate, the record—when read in its entirety—shows appellee testified to many acts of appellant after that date, which would reasonably place her in fear of imminent physical harm and which she said frightened her. The contention that nothing threatening happened from appellee's perspective during the ensuing ten-month period is simply not supported by a thorough reading of her testimony. Appellant also contends appellee admitted that the basis of her fear is appellant's refusal to obey her directive not to attend certain athletic events. Again, this excerpt of her testimony ignores the other acts appellee testified to subsequent to the December incident.

Appellant further argues Officer Dawson's testimony supports appellant's position that the finding of family violence is contrary to the great weight and preponderance of the evidence presented at the hearing. Appellant contends that, because Officer Dawson did not believe there was probable cause to pursue the case further when he met with appellee in December, the trial court's finding of family violence in June of the following year is without support.

Making all inferences in favor of the trial court's finding, as we must, we conclude appellee's testimony describing the

December 2001 incident and the events subsequent to that incident constitutes more than a scintilla of evidence that appellant engaged in an act that is a threat that reasonably placed appellee in fear of imminent physical harm, bodily injury, or assault. Moreover, we cannot say the evidence is too weak to support the court's finding or that the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. As the sole judge of the credibility of the witnesses and the weight to be given their testimony, the trial court was entitled to believe appellee's version of events. We overrule appellant's sole point of error.

## CONCLUSION

In the absence of other pending litigation between the parties, family-violence protective orders are final and appealable. We hold that the evidence is legally and factually sufficient to support the trial court's findings in this case and affirm entry of the protective order.