**Opinion issued June 22, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-21-00729-CV**

———————————

**ERIC SCOTT WALSH, Appellant**

**V.**

**REBECCA LEEANN GONZALEZ, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-69526**

---

## MEMORANDUM OPINION

A father appeals the five-year protective order granted to his child's mother under the Texas Family Code and Chapter 7B of the Texas Code of Criminal Procedure. In five issues, the father contends (1) insufficient evidence supports the protective order, (2) the trial court improperly restricted his possession of and access

to the child, (3) the trial court erred by entering an order lasting more than two years, (4) the trial court erred by awarding attorney's fees, and (5) the trial court erred by ordering child support. Because we agree that there was error in the attorney's fees award, we reverse in part as to fees and remand for further proceedings consistent with this opinion.

## Background

Eric Scott Walsh (Father) and Rebecca Leeann Gonzalez (Mother) previously were in a dating relationship. They have a child who, at the relevant time, was one year old.

In October 2021, Mother applied for a protective order for herself and the child in the 280th District Court.[1] Mother alleged that Father had committed family violence by physically assaulting her three days earlier, when they exchanged the child outside Mother's townhouse. Mother also alleged that Father's conduct was "reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass [her] and [the child]."

---

[1] The 280th District Court has been designated as the domestic-violence district court for Harris County and gives preference to domestic-violence cases. *See* TEX. GOV'T CODE § 24.112(h), (i). It is "the proper court in which to apply for a protective order irrespective of any other action pending in any other court." *Pruneda v. Granados*, No. 01-20-00043-CV, 2021 WL 2231267, at *11 (Tex. App.—Houston [1st Dist.] June 3, 2021, no pet.) (mem. op.) (citing *In re Keck*, 329 S.W.3d 658, 660 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding)).

At the hearing on Mother's application, Father appeared pro se. He told the trial court that he was trying to find a new attorney because his regular attorney for family law matters did not handle protective orders. The trial court declined to postpone the hearing for Father to retain counsel based on its assessment that Father could have contacted an attorney earlier. Because he was charged criminally in connection with the physical assault against Mother, Father invoked his Fifth Amendment right against self-incrimination at the hearing.[2] He did not present evidence or cross-examine witnesses.

For her part, Mother testified that she and Father had dated. Father had a "short fuse." Although the October assault that prompted her to apply for a protective order was the first physical violence between them, Father abused her verbally and emotionally in their dating relationship. She recalled some "acts of aggression," including when Father flipped a couch, threw items in the house, broke a laptop, or made her feel unsafe when she was in a car with him.

Mother and Father did not have a custody order, but they had agreed to a visitation schedule that typically gave Father possession of the child between 12:00 p.m. and 5:00 p.m. on Wednesdays and Sundays. On Sunday, October 17, 2021, Father picked up the child from Mother's townhouse around 11:00 a.m.

---

[2] The trial court admitted the information charging Father with assault into the evidence. The record does not show the disposition of the charge.

3

Mother told Father that she did not know when she would be home to take the child back because she had plans with friends. Around 4:00 p.m., while she was with her friends at a bar, Mother told Father she would not be home in time for the drop off. She did not tell Father where she was, but he found her at the bar and confronted her there, leaving the child unattended in his car. Father was frustrated but left the bar without harming Mother.

When Mother later returned to her townhouse with a friend, J. Valdez, Father and the child were waiting in Father's car in the parking lot. Because Mother knew Father was upset, she started an audio recording on her cell phone and asked Valdez to stay inside the townhouse. According to Mother, she opened Father's passenger-side rear door to retrieve the child, but the child was not there. Instead, the child was in the driver's seat with Father. Mother opened the passenger-side front door. Father tried to hand the child to Mother through the open door, telling her to "take [her] f– – ing [child]." When Mother told Father to calm down, he grabbed the child, exited the car, and struck Mother in the ribs. He then struck her two more times on her face, first with an open hand and then with a closed fist. Father was still holding the child when he struck Mother. He yelled that he "hate[d] [Mother]," was "gonna hurt [her]," and was "gonna kill [her]." Hearing the yelling, Valdez came outside, and Father "aggressively gave" her the child. Mother followed Father back

4

to his car, "let him know that he was wrong for what he did," and opened both passenger-side doors before Father "recklessly drove off," doors open.

The trial court listened to Mother's audio recording and viewed a video of part of the incident. In the audio recording, the child can be heard crying. Although Father is difficult to hear at times, he can be heard telling Mother to "take [her] f– – ing [child]" and that he "f – – ing hate[s] her," among other things. Mother yelled back, "Are you f – – ing crazy?"; "You don't f – – ing touch me"; and "You're done." At the end of the audio recording Mother tells Valdez, "He just hit me." The video recording shows Father getting back in his car as Mother follows and tells him, "You're f – – ing done," "You f – – ing touched me," before opening the passenger-side front and back doors as he drives off.

Some records of the criminal charge against Father were admitted into the evidence, including a probable cause affidavit from the police officer who responded when Mother reported the October incident. The probable cause affidavit states that the officer viewed video recorded by a neighbor's Ring doorbell camera, which showed Father approach Mother and punch her "on her right rib area and the right side of her face" while holding the child in his right arm.[3] The officer observed "redness and light swelling" on Mother's face.

---

[3] The Ring doorbell video was not offered at the hearing because, according to Mother's counsel, the neighbor did not respond to a subpoena.

The child was not physically injured in the October incident. But Mother testified that she feared for the child's and her own safety. She expressed concern that Father owned a firearm and was harassing her. She explained that Father sent her several text messages in the days after the October incident, including text messages containing about 50 pictures of himself in a single day.

In addition, Father threatened to withhold financial support for the child if he was not allowed to see the child. Mother testified that in a previous suit affecting the parent-child relationship (SAPCR), which she non-suited, Father provided his W-2 form for 2020, which showed income of $156,465. She asked the trial court to include child support based on that amount in the protective order.

Valdez testified that she was at Mother's townhouse when the October incident happened. Although she was inside the townhouse at first, she came outside when she heard yelling. She testified that Father "basically" threw the crying child into her arms. She did not see Father hit Mother, but she saw redness on Mother's face. She recalled that Mother cried "hysterically" and seemed "very scared."

Mother's attorney, C. Thorpe, testified on attorney's fees. She testified that Mother had incurred $3,812.50 in fees, which included attorney's fees billed at the rate of $300 per hour and paralegal fees billed at the rate of $150 per hour. That amount did not include Thorpe's effort to subpoena Mother's neighbors, time for the hearing, or "some additional prep work" on the day before the hearing. Thorpe

requested a total fee award of $5,000 for trial. She estimated appellate fees of $10,000 for the court of appeals and another $10,000 for the Texas Supreme Court. Thorpe's fee agreement and a detailed summary of her billing records were admitted into the evidence.

At the end of the hearing, the trial court stated that it would grant the protective order as to Mother and the child and made several oral findings, including that:

- Mother and Father "were members of the same family or household or previously involved in a dating relationship";

- family violence had occurred and was likely to occur in the future;

- Father committed the family violence;

- a protective order was "necessary for the safety and welfare of [Mother] and the child," "in the best interest of [Mother] and the child," and necessary for "the prevention of further family violence";

- reasonable grounds existed to believe that Mother was a victim of harassment under Section 42.07 of the Texas Penal Code and Chapter 7B of the Texas Code of Criminal Procedure, as pleaded by Mother in her application alleging that Father's conduct was "reasonably likely to harass, annoy, alarm, abuse, torment[,] or embarrass" Mother; and

- because of Father's conduct, under Chapter 7B of the Code of Criminal Procedure, the protective should be granted for longer than the "normal two[-]year period."

The trial court also stated that it would award temporary child support under the Family Code guidelines based on Father's 2020 tax return. Father responded: "I don't have a job, so that's gonna be tough, but okay." When the trial court inquired further, Father explained that he was furloughed from his job in the automotive

7

industry about one month before the hearing—around the time of the October incident—and no one in that industry was hiring because of "a chip shortage." He told the trial court that he was supporting himself with "small savings" of around $4,000 after drawing from his retirement account.

The next week, the trial court signed a five-year protective order that memorialized its findings at the hearing.[4] The order required Father to surrender his firearm and, among other things, prohibited him from (1) committing family violence; (2) contacting Mother or the child, except through Mother's attorney or the Talking Parents program; and (3) having possession of or access to the child until he completed nine battering intervention and prevention classes. After completing the classes, Father was entitled to visitation supervised by the Harris County Domestic Relations Office once every two weeks. The order also required Father to pay Mother $1,840 per month in child support and $5000 for attorney's fees, plus an additional $10,000 for an appeal. The order states that Mother is "entitled to a remittitur of ten thousand dollars ($10,000) if a petition for review is granted by the Supreme Court of Texas."

Father retained counsel post-judgment and moved for a new trial, arguing that Mother's application should have been brought in or transferred to the court that

---

[4] The protective order states that it is effective for five years under "Section 7B.051 of the Texas Penal Code." We note article 7B.051 is codified in the Texas Code of Criminal Procedure, not the Penal Code. *See* TEX. CODE CRIM. PROC. art. 7B.051.

handled the previous, non-suited SAPCR and that insufficient evidence supported the protective order. The motion was denied.

**Sufficiency of the Evidence**

Father's first three issues challenge the sufficiency of the evidence to support the protective order. Father contends the evidence is legally and factually insufficient to support the trial court's findings that: (1) family violence is likely to occur in the future, (2) his access to and possession of the child should be limited, and (3) the protective order should last more than two years. We address these issues in turn, as necessary for the disposition of the appeal. *See* TEX. R. APP. P. 47.1.

**A.      Standard of review**

We review the trial court's findings under the legal and factual sufficiency standards. *Yang v. Cao*, 629 S.W.3d 666, 670 (Tex. App.—Houston [1st Dist.] 2021, no pet.). When a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *City of Hous. v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). If more than a scintilla of evidence exists, it is legally sufficient. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005); *Hildebrandt*, 265 S.W.3d at

There is more than a scintilla of evidence if reasonable and fair-minded people could reach differing conclusions. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782–83 (Tex. 2001).

In reviewing factual sufficiency, we consider all the evidence, both in support of and contrary to, the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.). We will set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We cannot substitute our own judgment for the trial court's judgment just because we might reach a different conclusion. *Boyd*, 425 S.W.3d at 429. The trial court, as the factfinder, is the sole judge of the credibility of the witnesses and the weight of their testimony. *Id.* at 431.

**B.    Protective order standards under the Family Code and Code of Criminal Procedure**

Protective orders are governed by provisions in both the Family Code and the Code of Criminal Procedure. *Kloecker v. Lingard*, No. 01-19-00533-CV, 2021 WL 2096663, at *4 (Tex. App.—Houston [1st Dist.] May 25, 2021, pet. denied) (mem. op.); *Shoemaker v. State for Protection of C.L.*, 493 S.W.3d 710, 715 (Tex. App.— Houston [1st Dist.] 2016, no pet.).

Under the Family Code, "an adult member of the family or household" may apply for a protective order to protect herself or any other member of her family against family violence. TEX. FAM. CODE § 82.002(a). Relevant here, "family" includes "individuals who are the parents of the same child, without regard to marriage." *Id.* § 71.003. And "family violence" means:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself[.]

*Id.* § 71.004(1). A court must enter a protective order under the Family Code if it finds that family violence (1) has occurred and (2) is likely to occur in the future. *Id.* §§ 81.001, 85.001(b).

The protective order may prohibit a person found to have committed family violence from certain actions, including communicating with a person protected by the order; going to or near the protected person's residence, place of employment, or school; engaging in conduct that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the protected person; and possessing a firearm. *Id.* § 85.022(b). Generally, a family-violence protective order may not exceed two years, but it may last longer if the court finds that the respondent "committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household[.]" *Id.* § 85.025(a), (a–1).

11

Under the Code of Criminal Procedure, a victim of stalking, or other specified criminal offenses, may apply for a protective order. TEX. CODE CRIM. PROC. art. 7B.001(a)(1); *see* TEX. PENAL CODE § 42.072. The trial court may grant a protective order if it finds there are reasonable grounds to believe that the applicant is a stalking victim. TEX. CODE CRIM. PROC. art. 7B.003(a); *see Shoemaker*, 493 S.W.3d at 717. Stalking is a criminal offense under the Texas Penal Code. TEX. PENAL CODE § 42.072. Relevant here, a person commits the offense of stalking if, "on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person," he "knowingly engages in conduct that:"

(1) constitutes an offense under Section 42.07 . . . ;

(2) causes the other person . . . to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person to . . . (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

*Id.* The Section 42.07 reference is to the harassment statute. *Id.* § 42.07. A person harasses another if, "with intent to harass, annoy, alarm, abuse, torment, or embarrass another," he "sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another." *Id.* § 42.07(a)(7).

Thus, a Code of Criminal Procedure protective order may be issued against a person who has, more than once, knowingly harassed another person, which caused that person to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or

12

offended, and likewise, would have caused a reasonable person to feel the same way. *See id.* §§ 42.07, .072; TEX. CODE CRIM. PROC. arts. 7B.001, .003; *Shoemaker*, 493 S.W.3d at 717. The protective order may prohibit the offender from engaging in most of the actions described in Family Code Section 85.002(b), including possessing a firearm. *See* TEX. CODE CRIM. PROC. art. 7B.005(a)(1). And it "may be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." *Id.* art. 7B.007(a).

## C. Sufficiency of the evidence under the Family Code

### 1. As to Mother

In his first issue, Father argues that the evidence is legally and factually insufficient evidence to show that family violence is likely to occur in the future, which is a finding necessary for the issuance of a protective order under the Family Code. *See* TEX. FAM. CODE §§ 71.004, 85.001(a)(2). According to Father, the trial court could not reasonably infer a likelihood of future family violence from the October incident because that incident was isolated and unaccompanied by any ongoing harassment, threats, or violence.

The Family Code does not require more than one act of family violence to find that family violence is likely to occur in the future. *See id.* §§ 81.001, 85.001; *see also Boyd*, 425 S.W.3d at 432. "On the contrary, courts have recognized that '[o]ftentimes, past is prologue; therefore, past violent conduct can be competent

13

evidence which is legally and factually sufficient to sustain the award of a protective order.'" *Boyd*, 425 S.W.3d at 432 (quoting *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007)). "[A]n episode of family violence, coupled with continued harassment, permits an inference that family violence is likely to occur in the future." *Boyd*, 425 S.W.3d at 432 n.3.

Father cites three cases to illustrate the type of evidence this standard requires. *See In re Epperson*, 213 S.W.3d at 543–44; *Ulmer v. Ulmer*, 130 S.W.3d 294, 301 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Reyes v. Reyes*, No. 04-02-00758-CV, 2003 WL 22238914, at *2 (Tex. App.—San Antonio Oct. 1, 2003, no pet.) (mem. op.). In *Epperson*, the appellate court affirmed the finding that family violence was likely to occur in the future on evidence that: (1) the petitioner and the respondent became involved in a verbal confrontation that escalated into a physical confrontation; (2) the next day, the petitioner moved out of the shared home; (3) after the petitioner moved out, the respondent "began delivering bizarre, sometimes threatening notes" and "began calling [the petitioner's] workplace"; (4) authorities found the respondent hiding under a trailer on the property behind the house where the petitioner was staying; and (5) the petitioner perceived the respondent's messages and behavior as "very threatening." *Epperson*, 213 S.W.3d at 543–44. In affirming the likelihood finding, the court reasoned: "Based on the future tense used in the notes and [the respondent's] continuing pattern of

14

threatening behavior, it was reasonable for the trial court to conclude that [the respondent] would commit or, at a minimum, would threaten to commit acts constituting family violence." *Id.* at 544.

*Ulmer* involved divorced spouses. The petitioner there testified at the protective order hearing that, during the marriage, the respondent was "extremely controlling," "vengeful," and "repeatedly threatened her life." *Ulmer*, 130 S.W.3d at 297. The ex-spouses had one physical altercation in which the respondent became enraged and shoved the petitioner. *Id.* After this incident, the petitioner testified, the respondent's aggressive behavior escalated. *Id.* He (1) engaged in stalking and harassing behavior; (2) threatened that his prior threats to kill the petitioner "would come true"; (3) verbally assaulted her at the children's sporting events; (4) instigated arguments at her workplace; (5) repeatedly contacted the church where the petitioner's boyfriend worked; (6) sat in a parked truck outside the petitioner's boyfriend's house; (7) and yelled at the children if they hugged the petitioner. *Id.* at 297–98. The petitioner also testified that she was afraid the respondent would "snap." *Id.* at 298. The appellate court held the petitioner's testimony describing the physical altercation and the subsequent events was legally and factually sufficient to support the finding of a likelihood of future family violence. *Id.* at 300–01.

Finally, in *Reyes*, the appellate court held that the future family violence finding was supported by evidence of a pattern of past threatening behavior, including repeatedly violating past protective orders:

> Amelia [the petitioner] testified that she had a previous protective order against Miguel [the respondent] and he had violated it on six occasions, had been arrested on four occasions for assaulting her, and was currently serving a probated felony sentence for assault which he had violated by contacting her. She further testified that in the six months prior to the hearing, Miguel had vandalized her automobile and fired a weapon in the vicinity of her home, striking her automobile twice. Finally, she testified that she was terrified of him.

2003 WL 22238914, at *2.

According to Father, the record here is missing evidence of the type relied on in *Epperson*, *Ulmer*, and *Reyes*. We disagree. Even if the quantum of evidence is less in this case, Mother's uncontroverted testimony is more than a scintilla of evidence that family violence is likely to occur in the future. That is, viewed in the light most favorable to the trial court's finding, Mother's testimony is more than Father suggests.

Mother described only one instance of physical violence perpetrated against her by Father—the October incident when he hit her once in the ribs and twice in the face. But she also testified that Father had a "short fuse" when they dated and that their arguments escalated "very quick[ly]." In past outbursts, Father had flipped a couch, thrown items in the house, and broken a laptop. Before the October incident, Father went uninvited to the bar where Mother was with her friends to confront her,

16

even though she had not disclosed her location to him. During the October incident, Father not only physically assaulted Mother but also verbally threatened her, including by stating that he would kill her. And after the October incident, Father sent Mother text messages she found threatening, including as many as 50 pictures of himself in one day. In short, the evidence that Father was quick to anger, had previously tracked Mother to a location where he was not invited, became violent in the October incident, and harassed Mother via text messaging after that violence is more than a scintilla of evidence that, if not enjoined, Father would commit acts of family violence against Mother in the future. *See Boyd*, 425 S.W.3d at 432 (evidence of violent incident and harassing conduct following the incident was sufficient to support trial court's finding that future family violence was likely). This evidence is also not so weak as to make the trial court's finding of a likelihood of future family violence clearly wrong or manifestly unjust. *See id.*

We overrule Father's first issue.

### 3. As to the child

In his second issue, Father contends the evidence was legally and factually insufficient evidence to support a protective order on behalf of the child. While acknowledging it was "not healthy" for the child to be present for his physical altercation with Mother, Father correctly points out that no evidence showed he committed family violence against the child. Absent such evidence, he argues, the

17

trial court erred by restricting him to supervised visitation with the child during the protective-order period because that restriction exceeded what is required to protect the child's best interest.[5] According to Father, "any restriction on the parent-child relationship in a protective order must be the least-restrictive necessary to protect the child's best interest."

We agree with Father that the trial court did not find, and the evidence would not support, that he committed family violence against the child. But to the extent Father argues that finding was required, we disagree.

The trial court did not have to find that the child directly suffered family violence before listing the child as a protected person in the protective order. The category of people who may be protected by an order is broader than just the applicant and those who have suffered family violence. *See* TEX. FAM. CODE § 85.001. The Family Code provides that in instances of family violence by a member of a family or household against another member of the family or household, "an adult member of the family or household may file an application for a protective order to protect the applicant *or any other member of the applicant's family or household.*" *Id.* § 82.002(a) (emphasis added); *see id.* § 71.004(1); *Onkst v. Morgan*, No. 03-18-00367-CV, 2019 WL 4281913, at *8 (Tex. App.—Austin

---

[5] Although the protective order states that it is effective for five years, the trial court instructed Father that he could return after one year for a determination of whether the restrictions were no longer needed.

18

Sept. 11, 2019, pet. denied) (mem. op.) (court is authorized to issue protective order including members of protected person's family); *Martin v. Martin*, 545 S.W.3d 162, 168 (Tex. App.—El Paso 2017, no pet.) (even if evidence was not sufficient to show children were victims of family violence, prohibitions in order were still appropriate because the "protections contemplate that contact with another member of the family might escalate and involve the protected person"). This is because an applicant's family members may be at risk of suffering family violence because of their relationship to the applicant, even if they have not yet suffered harm. *See Dolgener v. Dolgener*, 651 S.W.3d 242, 259 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

Here, it is undisputed that the child is a member of Mother's family and household. *See* TEX. FAM. CODE §§ 71.003 (defining family), 71.005 (defining household). Thus, Mother was authorized to request that the child be protected in the order without requesting a finding of family violence against the child. *See id.* ("[A] trial court may list a child who is a family member of a victim of family violence as a protected person under the [protective] order, even if the child did not directly suffer family violence.").

In the protective order, the trial court could enjoin certain conduct or impose conditions, as provided by Section 85.021, on any party if doing so is in best interest of the protected person or a member of the protected person's family or household. *See* TEX. FAM. CODE §§ 85.001(b)(2), 85.021. Relevant here, the court may prohibit

a party from removing a child from "the possession of the person named in the order" and "provide for the possession of and access to a child of a party if the person receiving possession of or access to the child is a parent of the child." *Id.* § 85.021(1)(A)(i), (3).

The trial court heard testimony that the October incident occurred during an exchange of the child between Mother and Father. That incident, which became violent, occurred not just in the child's general presence but within the immediate proximity of the child. Father was holding the child when he yelled profanity at Mother and struck her three times. The child can be heard crying during the confrontation in the audio recording. Before this physical altercation, when Father sought to confront Mother at a bar that he was not invited to and had not been told the location of, the child was in his possession but left unattended in the car. In addition, from Mother's testimony that Father threatened to withhold financial support for the child after the October incident, the trial court could reasonably infer that Father tried to use access to the child to control Mother's behavior. Viewed in the appropriate light, this is more than a scintilla of evidence supporting the award of exclusive possession of the child to Mother and the requirement that Father's possession be supervised, and therefore it is legally sufficient. *See id.* §§ 85.001(b)(2), 85.021(1)(A)(i), (3); *see also Dolgener*, 651 S.W.3d at 263. Moreover, this uncontroverted evidence is not so weak as to be factually insufficient.

20

*See* TEX. FAM. CODE §§ 85.001(b)(2), 85.021(1)(A)(i), (3); *see also Dolgener*, 651 S.W.3d at 263.

We overrule Father's second issue.

**D.    Sufficiency of the evidence under the Code of Criminal Procedure**

In his third issue, Father contends the trial court erred by granting a protective order effective for more than two years because it did not make the findings necessary under the Family Code to do so. *See* TEX. FAM. CODE §§ 85.025(a), (a–1). Under the Family Code, a protective order may last for longer than two years only if the respondent:

> (1)    committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense; [or]
>
> (2)    caused serious bodily injury to the applicant or a member of the applicant's family or household . . . .

*Id.* § 85.025(a–1). Father states: "[T]he [trial court's] order does not even purport to make findings meeting this standard, and no evidence would support such findings." We disagree Father has shown error in this regard.

In the written protective order, the trial court found that Mother and Father had dated, that family violence had occurred, that family violence was likely to occur in the future, and that Father had committed family violence. But the trial court also found that there were reasonable grounds to believe that Father had engaged in

21

conduct that constituted harassment under Penal Code Section 42.07, which is a basis for the offense of stalking under Penal Code 42.072, and that the conduct was likely to occur in the future. *See* TEX. PENAL CODE §§ 42.07, 42.072. Relevant to that finding, the trial court heard evidence that before and after the October incident, Father repeatedly sent Mother text messages she found threatening. *See id.* § 42.07(a)(7) (person commits offense of harassment if "within intent to harass, annoy, alarm, abuse, torment, or embarrass another," he "sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another").

Although Father complains this harassment is not a "felony offense involving family violence" that will support an extended protective order under the Family Code, that is not controlling. The trial court issued its protective order under *both* Family Code Chapter 85 and Code of Criminal Procedure Chapter 7B. And for protective orders issued under the Code of Criminal Procedure, the order "may be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." TEX. CODE CRIM. PROC. art. 7B.007(a). The trial court thus had statutory authority to make the protective order effective for five years.

We overrule Father's third issue.

**Attorney's fees**

Family Code Section 81.005 gives the trial court discretion to award attorney's fees to a successful protective-order applicant against the party who is found to have committed family violence:

> The court may assess reasonable attorney's fees against the party found to have committed family violence or a party against whom an agreed protective order is rendered under Section 85.005 as compensation for the services of a private or prosecuting attorney or an attorney employed by the Department of Family and Protective Services.

TEX. FAM. CODE § 81.005(a). Again here, the trial court found Father committed family violence, issued the protective order, awarded Mother the full amount of attorney's fees she requested for the trial ($5,000), an appeal to the court of appeals ($10,000), and an appeal to the Texas Supreme Court ($10,000).

In his fourth issue, Father contends these awards should be reversed because (1) the evidence of the trial fees is legally and factually insufficient, (2) the evidence of the appellate fees is legally insufficient, and (3) the appellate fees are not conditioned on an unsuccessful appeal. We agree with Father in part.

**A.    Trial fees**

Section 81.005 authorizes an award of "reasonable" attorney's fees. *Id.* § 81.005(a). The starting point for calculating an award of attorney's fees is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts.

23

*See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019); *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Rohrmoos Venture*, 578 S.W.3d at 498.

Mother's attorney Thorpe briefly testified that she was licensed to practice law in Texas in 2014, had exclusively practiced family law with the Skillern Firm since then, including in cases like this one involving the prosecution or defense of protective orders, primarily in Harris County. She also testified:

- "[i]t was necessary for [Mother] to retain [her] services and the services of the Skillern Firm";

- her hourly rate is $300;

- she charged an hourly rate of $150 for the "substantive legal work" performed by paralegals;

- the "paralegals who assisted [her] on this matter traditionally performed work done by paralegals" or were supervised by attorneys;

- Mother had incurred $3,812.50 at the time of the hearing, but that amount did not include "subpoenas that were issued to the neighbors who did not appear" and "some additional [trial] prep work";

- the fees incurred by Mother are not contingent; and

- the fees incurred by Mother are "reasonable and not illegal or unconscionable."

In determining the reasonableness of the fees, Thorpe considered "the time and labor required, the novelty and difficulty of the questions involved, . . . the skills requisite to perform the legal services property[,] [t]he likelihood that [her] acceptance of [her] employment with [Mother] would preclude other employment[,] and the fees customarily charged." Thorpe testified that Mother was requesting $5,000 for the legal services rendered through trial.

Thorpe substantiated the hours worked with a detailed billing records summary, which was itemized by both the practitioner (whether Thorpe or one of three others: B. Gonzales, B. Gregg, or H. Williams) and the task performed and then multiplied by each practitioner's respective billing rate by quarter of an hour worked. While this evidence supports the attorney's fees awarded by the trial court for Thorpe's legal services rendered through trial, it will not sustain the entirety of the trial fees award. *See id.*

We find that the fees charged for work done by Thorpe's paralegals are not sufficiently supported. The billing records summary shows that Mother incurred $937.50 in attorney's fees for work performed by two paralegals: Gregg ($825) and Williams ($112.50). An attorney's fee award may include compensation for work performed by paralegals. *See El Apple I*, 370 S.W.3d at 763 (setting out requirements for proof of work done by paralegals). But to recover paralegal fees, the evidence must show: (1) the paralegal's qualifications to perform substantive legal work,

25

(2) that the paralegal performed substantive legal work under an attorney's direction and supervision, (3) the nature of the legal work performed, (4) the paralegal's hourly rate, and (5) the number of hours the paralegal expended. *Land v. Land*, 561 S.W.3d 624, 642 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see Gill Sav. Ass'n v. Int'l Supply Co.*, 759 S.W.2d 697, 703 (Tex. App.—Dallas 1988, writ denied). "Paralegal fees have been denied absent such proof." *El Apple I*, 370 S.W.3d at 763 (citing *Moody v. EMC Servs., Inc.*, 828 S.W.2d 237, 248 (Tex. App.—Houston [14th Dist.] 1992, writ denied)).

Mother addressed some of the factors for work performed by Thorpe's paralegals through Thorpe's testimony that they did work traditionally performed by paralegals or worked under the direction of an attorney and the billing records summary showing the tasks performed, the hours worked, and the rate charged. But no testimony or other evidence established the paralegals' qualifications to perform the work. A fee award cannot compensate for work performed by paralegals without such evidence. *See Mahmoud v. Jackson*, No. 05-21-00302-CV, 2022 WL 2167683, at \*8 (Tex. App.—Dallas June 16, 2022, no pet.) (mem. op.) (concluding evidence insufficient to support legal assistant fees when no evidence showed qualifications to perform substantive legal work billed or that legal work was performed under supervision of attorney); *Land*, 561 S.W.3d at 642–43 (same).

Thus, we sustain that part of Father's fourth issue challenging the legal sufficiency of the evidence supporting the award of fees for the work performed by Thorpe's paralegals. We overrule Father's fourth issue in all other respects as to the trial attorney's fees.

## B.    Appellate fees

Father's fourth issue also challenges the award of attorney's fees for appeals to this Court and the Texas Supreme Court. On appellate fees, Mother only presented Thorpe's testimony that:

> If this is appealed, [she] would estimate that the attorney's fees on appeal would be approximately $10,000 to the appellate court and $10,000 to the Texas Supreme Court.

Father complains that this testimony is legally insufficient to support those fees because, among other things, Thorpe failed to explain the reasonableness and necessity of such fees. We agree.

Texas law allows for an award of appellate attorney's fees if the award is contingent upon the appellant's unsuccessful appeal.[6] *Ogu v. C.I.A. Servs., Inc.*, No. 01-09-01025-CV, 2011 WL 947008, at *4 n.3 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.); *Keith v. Keith*, 221 S.W.3d 156, 171 (Tex. App.—

---

[6]    Because the trial court's award of appellate attorney's fees is not contingent on the results of any appeal, it is improper for that reason. *Keith v. Keith,* 221 S.W.3d 156, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.). But we need not resolve that error because our holding related to the evidence of appellate fees requires a remand for the redetermination of those fees. *See* TEX. R. APP. P. 47.1.

Houston [1st Dist.] 2006, no pet.). The Texas Supreme Court decided what is legally sufficient evidence for a contingent award of appellate fees in *Yowell v. Granite Operating Co.*, 620 S.W.3d 335 (Tex. 2020). The Court explained that "with respect to contingent appellate fees, which have not yet been incurred and thus must be projected based on expert opinion testimony," "[t]here is no certainty regarding who will represent the appellee in the appellate courts, what counsel's hourly rate(s) will be, or what services will be necessary to ensure appropriate representation in light of the issues the appellant chooses to raise." *Id.* at 355. But "this uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Id.*

Our sister courts have reversed contingent appellate fee awards for failure to meet the *Yowell* standard. *See, e.g., Milliken v. Turoff*, No. 14-19-00761-CV, 2021 WL 2156224, at *3 (Tex. App.—Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.); *Porter v. Porter*, No. 04-20-00229-CV, 2021 WL 2117923, at *4–5 (Tex. App.—San Antonio May 26, 2021, no pet.) (mem. op.); *Aguilar v. Wells Fargo Bank, N.A.*, No. 07-20-00036-CV, 2021 WL 317641, at *6 (Tex. App.—Amarillo Jan. 29, 2021, no pet.) (mem. op.); *Fiamma Statler, LP v. Challis*, No. 02-18-00374-CV, 2020 WL 6334470, at *19 (Tex. App.—Fort Worth Oct. 29, 2020, pet. denied) (mem. op.); *KBIDC Invs., LLC v. Zuru Toys Inc.*, No. 05-19-00159-CV,

28

2020 WL 5988014, at *24 (Tex. App.—Dallas Oct. 9, 2020, pet. denied); *see also U.S. Bank Nat'l Ass'n v. Lamell*, No. CV H-19-2402, 2021 WL 4440179, at *3 (S.D. Tex. May 20, 2021) (order). Because Thorpe did not provide testimony about "*the services* [she] reasonably believes will be necessary to defend the appeal" or "a reasonable hourly rate *for those services*," *see Yowell*, 620 S.W.3d at 355 (emphases added), we conclude that legally insufficient evidence supported the award of appellate attorney's fees.

Father requests that if we conclude the evidence is legally insufficient, we render judgment that Mother take nothing on her request for appellate fees. But our sister courts that have applied *Yowell* to reverse a contingent award of appellate fees have remanded for redetermination of those fees rather than render a take-nothing judgment. *See Milliken*, 2021 WL 2156224, at *3; *Porter*, 2021 WL 2117923, at *5; *Fiamma Statler*, 2020 WL 6334470, at *19; *KBIDC Invs.*, 2020 WL 5988014, at *24; *cf. Rohrmoos Venture*, 578 S.W.3d at 506 (remanding for redetermination of fees after concluding evidence is legally insufficient to support attorney fee award). We will do the same.

On remand, Mother is not entitled to recover attorney's fees for work performed on any issue on which Father succeeded on appeal. *Lynch v. Lynch*, 540 S.W.3d 107, 114 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *see also Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, No. 09-14-00316-CV,

2017 WL 4182292, *10 (Tex. App.—Beaumont Sept. 21, 2017, no pet.) (mem. op.). If a party is entitled to attorney's fees from the adverse party on one claim but not another, the party claiming attorney's fees must segregate the recoverable fees from the unrecoverable fees. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Thus, on remand, the trial court should determine the reasonable amount of appellate attorney's fees to be awarded to Mother considering Father's partial success in this appeal. *See Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. App.—Dallas 1988, writ denied).

We sustain that part of Father's fourth issue challenging the award of appellate attorney's fees.

## Child support

The Family Code authorizes the trial court to require in a protective order the "payment of support for . . . a child of a party if the person required to make the payment has an obligation to support . . . the child." TEX. FAM. CODE § 85.021(4). Here, the trial court's protective order requires Father to pay Mother $1840 monthly in child support. Father contends in his fifth issue that, in awarding this amount, the trial court misapplied the child support guidelines in Chapter 154 of the Family Code. *See id.* §§ 154.001–.309. According to Father, the guidelines required the trial court to set his child support obligation at a lower amount based on the federal minimum wage. In support, Father cites his own testimony that he was unemployed,

30

that circumstances in the automotive industry prevented him from working, and that he had about $4,000 to live on, which was what remained from what he had taken from his retirement savings. And he correctly points out that the trial court made no finding that he was intentionally unemployed or underemployed for the purpose of calculating his support obligation.

Assuming without deciding that the Chapter 154 guidelines apply to a support obligation established by a protective order and that Father's statements to the trial court during its rendition are evidence,[7] we disagree with Father that the trial court had to calculate a lower amount of child support. Under Chapter 154, the trial court must "calculate net resources" to determine a party's child support obligation. *Id.* § 154.062(a). "Resources" include, among other things, all wage and salary income, interest, dividends, self-employment income, rental income, and all other income actually being received, such as retirement benefits. *Id.* § 154.062(b). "There must be some evidence of a substantive and probative character of net resources in order for the trial court to discharge its duty under section 154.062." *Miles v. Peacock*, 229 S.W.3d 384, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quotation omitted). Without evidence of the wage and salary income of a party, a court shall presume

---

[7] Mother complains that Father's testimony about his financial circumstances is not evidence because it was given after the parties rested and during the trial court's rendition of its ruling. Given our disposition of this issue, we need not address this complaint. *See* TEX. R. APP. P. 47.1.

that the party has wages or salary equal to the federal minimum wage for a 40–hour week. TEX. FAM. CODE § 154.068.

Father's argument that the trial court should have calculated his support obligation based on the federal minimum wage rests on assumptions that his testimony was the only evidence of his resources and that the trial court was required to believe his testimony. These assumptions are incorrect. As the factfinder, the trial court was not required to accept Father's evidence of his net resources as true. *Kinney v. Batten*, No. 01-21-00394-CV, 2023 WL 2316354, at *11 (Tex. App.—Houston [1st Dist.] Mar. 2, 2023, no pet. h.) (mem. op.). Instead, the trial court could determine that Father had higher net resources than he alleged based on (1) Mother's unobjected-to and uncontradicted testimony that he worked, or had worked, for Audi and that his W-2 federal tax form for 2020, which he disclosed in the prior non-suited SAPCR, showed $156,465 in income; (2) Father's testimony that he had been furloughed for only one month before the protective order hearing; and (3) Father's testimony that he had retirement savings.

Accordingly, we overrule Father's fifth issue.

## Conclusion

For the reasons stated, we reverse that part of the trial court's judgment awarding Mother paralegal fees and that part of the trial court's judgment awarding Mother attorney's fees for appeals to this Court and the Texas Supreme Court. We

32

remand to the trial court for further proceedings at which the trial court shall delete the paralegal fees awarded to Mother and redetermine the appellate fees, consistent with this opinion. We otherwise affirm.


Sarah Beth Landau
Justice

Panel consists of Justices Landau, Countiss, and Guerra.